Anthony, Appellant, *v.* Perose.

Argued April 20, 1972.   Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

234

*James G. Kellar,* for appellant.

*S. Maxwell Flitter* and *Robert J. Johnson,* for appellees.

OPINION PER CURIAM, December 4, 1973:

Lehigh Tile & Marble Co., a partnership, appellee herein, in 1952 purchased from New York Life Insurance Company a "key man" policy of insurance in the face amount of $25,000 on the life of its Office Manager, John Anthony. Upon appellant's resignation from Lehigh to take a position with another firm, he demanded delivery of the policy to him. This denied, the present suit in equity was brought to compel transfer of ownership of the policy, including all dividends thereon, to plaintiff. The complaint also prayed that the employer be declared a trustee of the policy for plaintiff's benefit, and that it be ordered to pay to plaintiff an amount equal to all of the premiums paid on the policy from the date of issuance, together with dividends and interest thereon. After a trial the complaint was dismissed. The court *en banc* overruled exceptions to the chancellor's adjudication, and entered a final decree, from which this appeal was taken.

The court below found that the policy had been obtained pursuant to an application signed jointly by the Company and by Anthony. As requested in the application, the policy, a 20-year endowment contract, named the appellant as the insured and the Company as owner and beneficiary. The annual premium was $1077.00 and, as the chancellor found, the premium payments were made by the Company with its own funds; its cancelled checks representing the payments were in evidence. The Company received dividends on the policy and paid income tax thereon.

Had this been the whole story, no doubt the present suit would not have been brought; the complaint has its foundation in the manner in which the Company

handled the premium payments. Presumably knowing that premiums on key man insurance on the life of an employee of a taxpayer are not deductible where the taxpayer-partnership is a beneficiary under the policy,[1] the Company's accountant suggested that deductibility be achieved indirectly by *purporting* to increase the amount of Anthony's year-end bonus payments by an amount equivalent to the annual premium.[2]  Mr. Anthony was informed of the nature of and acquiesced in this tax avoidance device.[3]  The chancellor found that

[1] See Internal Revenue Code of 1954, §264; Treas. Reg. §1.264-1(a).

[2] The bonus also included the approximate amount of additional federal income tax Anthony would have to pay because of the purported additional $1077 in his yearly compensation, as reflected in the W-2 form and the 1099 form furnished by the Company. Compensation paid to employees is, of course, an ordinary and necessary expense of doing business and is deductible.

[3] The senior and controlling partner, Roger Perose, Sr., who caused the insurance to be taken out and who reviewed appellant's compensation with him annually, had died prior to this litigation. The principal evidence concerning the treatment of the premium as income to Anthony was given by the accountant, Philip T. Verrichio. He testified as follows: "Q. Now then was this payment of $1077.00 charged in any way to John P. Anthony? A. The amount was credited to John P. Anthony, yes. Q. Now can you explain to the court just how this was done? A. The law states that it would be discriminatory to take a key man insurance policy out on one man and not all the employees of the company and therefore you could not deduct, the partnership could not deduct the amount of the premium paid. When I related this to Mr. Perose I stated and recommended that it would not be contradictory that if he issued this amount to the New York Life but if John Anthony would pick this amount up on his personal tax return *and if we included an amount in his bonus to pay the taxes*— . . . [objection made and overruled] *That the additional tax dollars to cover the tax of, to cover the income of $1077.00 was included in the annual year end remuneration*— . . . .[objection made and overruled] Q. Now the $1077.00 was paid by the partnership and the corporation, correct? A. Yes sir. Q. However, if you know, did this payment show in the income tax return of John P. Anthony? A. Yes sir. Q. Now can you state of

whatever the tax consequences of this arrangement might be, "the source of the funds used to pay the premiums was clearly Lehigh Tile & Marble Co., and not the plaintiff." He further found that appellant had failed to prove that Lehigh had been unjustly enriched, or that there was any evidence of an agreement that appellant was to be the owner or beneficiary of the policy.[4]

your own knowledge how that was covered as far as the company was concerned; that is, the payment of income tax on the $1077.00? . . . [objection made and overruled] A. . . . [T]*here was included in the year end remuneration to John P. Anthony sufficient dollars therein to cover the tax consequently* [sic] *of including the $1077.00 in his own income tax return.* Q. Did you have anything to do with including the amount of income tax in the money which was allowed as a bonus to Mr. Anthony? . . . [objection made and overruled] A. Yes, because I was very closely in confidence with the partnership and the partners therein even to the extent that the $5000.00 check in September 30, 1967 is in my own handwriting and, therefore, I determined in what percentage bracket the tax impact of this $1077.00 would fall, and therefore, mentioned that to Mr. Perose or the partners as to what *could be included therein to cover the tax.* Q. Did you ever have any conversation with Mr. Anthony in connection with the $1077.00 that was paid for the premium for this policy? A. Yes sir. . . . *I mentioned to Mr. Anthony that, what accounting procedures I was implementing* for the best tax advantage of all parties concerned, and that everyone would benefit therefrom, *and if he had any objection thereto that he would advise me since I did include this amount on his W-2* or issue to him a 1099. Q. What did he say? A. He, not quoting exact words, but it was agreeable even to the fact that for two years I filed his personal tax so that we both had adequate knowledge of what procedures we were following. . . . Q. At that time was there anything said about the $1077.00, the amount of the premium? A. Just that I asked him if he was receiving ample dollars to pay the tax thereon. Q. Did you ask him whether he was receiving ample dollars to pay the tax on this amount, the yearly premium? A. Yes sir. Q. In making up his income tax return did you take into consideration the amount of money that was necessary for him to pay the income tax on the $1077.00? A. Yes sir." (Emphasis added throughout.)

4 "A contrary intent cannot be found from plaintiff's vague testimony attributing to Roger L. Perose Sr. statements that plaintiff

It is, of course, well established that the findings of a chancellor, sustained by a court *en banc,* have the force and effect of a jury verdict and will not be disturbed on appeal if supported by evidence. *Lewkowicz v. Blumish,* 442 Pa. 369, 275 A. 2d 69 (1971) ; *Horsham Township v. Weiner,* 435 Pa. 35, 255 A. 2d 126 (1969). There was ample evidence here to support the chancellor's finding that the crediting to appellant of the amount of the premium, $1077.00 per annum, was never intended by the employer as *real* compensation for appellant's services and was never understood by the employee to be such. The further additional payment to Mr. Anthony to cover the payment of income tax incurred by reason of the enhanced bonus is clear indication that the $1077.00 was not compensation; this additional payment was obviously designed to make Mr. Anthony whole with respect to tax paid by him on income purportedly his but which was not in fact his and which he never actually received. Appellant's claim that the employer Company has been unjustly enriched at his expense seems clearly to be an attempt to make of the Company's tax manipulation a windfall to himself. But the fact that fictitious accounting, which we of course do not condone, may entail liability to the taxing authorities does not serve to vest a right of action in this appellant, who was in no way injured.

Decree affirmed. Each party to bear own costs.

Mr. Justice Nix concurs in the result.

----

DISSENTING OPINION BY MR. JUSTICE MANDERINO:

I must dissent. The appellee employer in this case has been unjustly enriched at the expense of the appellant employee and there is not one shred of evidence to support the majority's denial of restitution to the em-

----

needed insurance for the protection of himself and his family." Adjudication, 160(a)-161(a).

ployee. For seventeen years, the employer made a *payroll deduction* for life insurance from the employee's *gross pay*. During the entire seventeen years the employee paid federal income tax on his *gross pay*. Each year, for seventeen years, the employee's gross compensation was reviewed personally for the employee by one of the partners in the business. The employee was *never* told that the payroll deductions were a sham. On the contrary, he was told exactly the opposite—that his *true gross pay* was exactly what was listed on his W-2 forms and on the company books. One of the employer's partners *so testified* and *admitted* that the payroll deductions were the employee's money and were always considered part of the employee's gross pay. The majority completely *ignores* this testimony by one of the partners who *personally* reviewed the employee's gross compensation in two year-end meetings. That partner testified as follows: "Q. Did you not in December of 1967 and in December of 1968 personally go over with Mr. Anthony a listing of *the amounts and various types of compensation which had been paid and were being paid to him for those years* as an employee of the company? A. Yes I think that was the usual procedure, I guess, to name everything down the line. Q. In 1967 and '68 you went over this listing with Mr. Anthony, is that correct? A. If you want to say that, yes. Q. I don't want to say it. Did you or didn't you? A. It's *the same procedures that was done previous in the other years* and I didn't change the practice. What was done was just as you said. Q. The practice was that in December of each year there would be a listing made of the salary that had been paid to Mr. Anthony on a weekly basis, a listing of expenses *and a listing of other benefits that were paid to him or for him and on his behalf,* correct? A. *It was his wages which at that time was $200.00 a week. It was the expenses that occurred plus the gift that we gave to him at the end of the year which*

*was part of the $1,077.* Q. When you say gift, *are you talking about a bonus* that he was paid? A. *I would say it was a gift. I don't know if you call it a bonus. This is what my father did for him at the end of the year.* Q. A bonus? A. *A gift. You call it bonus. I call it a gift.* Q. But *it was given and paid to Mr. Anthony from the company funds as an employee of the company, is that correct?* A. *That's right."* (Emphasis added.)

Why does the majority opinion ignore the above testimony? It completely verifies the facts as reflected on the employer's books for seventeen years, on the employee's W-2 forms for seventeen years, and on the employer's tax return for seventeen years. Instead of accepting the seventeen-year record of written documentation and the *admission* of the employer's partner which is unequivocal, the majority *selects* portions of the testimony of the employer's accountant and concludes that the employee "knew of and acquiesced" in a tax avoidance device, and *"understood"* that his W-2 forms did not reflect his true compensation. Whoever told the employee what the majority claims the employee knew? Certainly not the partner who verified the facts as reflected for seventeen years on the company books and on all tax records.

The majority says that the employer's accountant told the employee that the payroll deduction each year was a sham. I must categorically dispute that interpretation of the accountant's testimony. The accountant testified to no such thing. He did testify that he discussed with his *employer* a tax avoidance device but *the employee was never present* in these discussions with the employer. Employers all over America may be discussing tax avoidance devices with their accountants—but those discussions surely cannot legally affect an employee's rights. Moreover, when we examine *exactly* what the accountant told the employee, we find

only very *equivocal testimony,* and *no testimony that a tax avoidance device* was ever discussed with the employee. The accountant was most cautious in his testimony about his discussions with the employee. We must examine *exactly* what the accountant said, not what we think he said. All of the accountant's testimony about a tax avoidance device concerns his conversations *with the employer—not the employee.* When asked what he told the employee, the accountant said he mentioned "the accounting procedures . . . for the best tax advantages of all parties . . . everyone would benefit. . . ." This is a far cry from the majority conclusion that the employee was told his payroll deductions were a sham. When the accountant was specifically asked if anything was said to the employee about the insurance premium deduction, the accountant answered *"just* that I asked him if he was receiving ample dollars to pay the tax thereon."

During cross-examination, the accountant was specifically asked: "Q. Now, Mr. Verrichio, [the accountant] when Mr. Anthony [the employee] asked you why this $1,077.00 was being put on his W-2 as additional compensation, *did you say anything more to him than it has to be done this way for tax reasons.* Was that *the gist* of your explanation and *about the extent* of your explanation? A. *I would think so, yes."* (Emphasis supplied.)

Why did the employee even ask the question? There is only one possible answer. *He had been promised insurance benefits* by his employer, as he testified, but did not know why the cost was on his W-2 form. The employee was not an accountant or a tax expert. He was an employee who was told he would receive insurance benefits and asked why they were on his W-2 form. The accountant *did not then answer* "it's a tax avoidance device, it's not really your money" or "you do not have any insurance benefit, you know that." The only an-

swer the accountant gave—in fact, the "gist" and "extent" of his explanation as he admitted—was that "it has to be done this way for tax reasons." What had to be done that way for tax reasons? What was the accountant talking about?

The accountant's testimony makes complete sense only when read in the light of the partner's testimony verifying the employee's testimony. The employee was to receive an insurance benefit and the accountant devised a way to give that benefit and also help the employer.

I must comment on other testimony by the accountant. He testified, according to the majority, that he helped the employee prepare his tax returns. So what? He never said he told the employee that the employee was not to receive any insurance benefit from the yearly payroll deduction. In addition, the accountant admitted that he helped the employee with his tax return for *only two years* and *he could not remember* what years. This help could have occurred years after the yearly payroll deduction began. The accountant also admitted that for over fifteen years he had nothing to do with determining the total amount of the employee's yearly compensation. He testified that he would tell a partner the approximate amount that would have to be included in the employee's bonus to pay taxes on the payroll deduction for insurance—but the partner, not the accountant, then determined the total amount of the employee's regular draws and bonus compensation. The accountant had nothing to do, by his own admission, with the amount of the employee's gross pay and did not participate in the year-end compensation and bonus review between the employee and a partner. The accountant *knew nothing* about conversations between the employee and the employer concerning the employee's true total compensation. The only witness who did know and participated in conversations with the em-

ployee about his compensation, *admitted* that deductions for insurance were *the employee's money*—not the employer's. There is *absolutely no testimony* in this record that anyone ever told the employee that his W-2 did not reflect his true compensation. A partner admitted that it did. There is *no testimony* that the employee knew the accountant was cheating the federal government. *No one testified* that he was so told. In effect, there is not one shred of evidence to support the trial court's conclusions and the majority's conclusions.

All of the evidence in this record supports only one conclusion—that the total amount stated on employee's tax statements and on the written year-end statements reflected the employee's real compensation. Thus, the deductions made by the employer each year, from the employee's total compensation, constituted a withholding of monies by the employer which belonged to the employee. To allow the employer to retain the benefit of these monies would constitute an unjust enrichment. The employee is, therefore, entitled to restitution.

"Where one party has been unjustly enriched at the expense of another, he is required to make restitution to the other. In order to recover, there must be both (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied." *Meehan v. Cheltenham Twp.*, 410 Pa. 446, 449, 189 A. 2d 593, 595 (1963).

The employer was obviously enriched by the retention of the employee's monies as they were deducted each year for seventeen years. An injustice would certainly result if recovery is denied to the employee. For seventeen years, the employee reasonably assumed and was led to assume that his employer was withholding monies from his gross compensation and that these withholdings were being used for the employee's insurance benefits. The employee may have assumed too

much by concluding that his insurance benefits would eventually come from a specific insurance policy, but he did not assume too much in concluding that he would receive *some benefit for his money.*

The employer has had the benefit of using the employee's money for seventeen years. The proper restitution to the employee is the amount of enrichment received by the employer. *Wingert v. T. W. Phillips Gas & Oil Co.,* 398 Pa. 100, 157 A. 2d 92 (1959). The employee is, therefore, entitled to a return of the amount deducted each year from his gross compensation with interest computed annually on the amount of the employee's money retained by the employer, including interest each year on the accumulated deductions and accumulated interest. Restatement of Restitution §156 (1937). Such restitution is the amount of enrichment received by the employer during the seventeen-year period.

I would reverse the decree and remand the case for further proceedings consistent with this opinion.

Mr. Justice Roberts joins in this dissenting opinion.